# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA

**ASHLEY DIAMOND,**

    **Plaintiff,**

v.                                             Case No. 5:15-cv-50-MTT-CHW

**BRIAN OWENS,** *et al.***,**

    **Defendants.**

## STATEMENT OF INTEREST OF THE UNITED STATES

Failure to provide individualized and appropriate medical care for inmates suffering from gender dysphoria[1] violates the Eighth Amendment's prohibition on cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Kothmann v. Rosario*, 558 F. App'x 907, 910 (11th Cir. 2014); *Fields v. Smith*, 653 F.3d 550, 554-55 (7th Cir. 2011); *Lynch v. Lewis,* No. 7:14-CV-24, 2014 WL 1813725, at *2 (M.D. Ga. May 7, 2014). In her first Motion for Preliminary Injunction (ECF No. 1), Plaintiff Ashley Diamond alleges that the Georgia Department of Corrections ("GDOC") violated the Eighth Amendment by withholding treatment for Ms. Diamond's gender dysphoria against the advice and recommendations of her treating clinicians.

Ms. Diamond alleges that GDOC withheld this care pursuant to an unconstitutional "freeze-frame" policy. A "freeze-frame" policy impermissibly prohibits individualized

---

[1] The terms "gender dysphoria," "gender identity disorder," and "transsexualism" are used interchangeably in the case law and the record in this case. The United States uses the term "gender dysphoria" in this Statement of Interest except when quoting case law or other parts of the record.

assessment and treatment of individuals with gender dysphoria. Instead, prisoners may only receive the same level of care they received in the community. Under GDOC's policy, if an inmate is not identified as transgender and referred for treatment at intake, he or she may receive no treatment at all. According to Ms. Diamond, because GDOC did not identify her as transgender at intake and refer her for additional evaluation, GDOC officials continue to deny Ms. Diamond treatment pursuant to GDOC's freeze-frame policy.

Without taking a position on the factual accuracy of Plaintiff's claims, the United States files this Statement of Interest to assist the Court in evaluating Ms. Diamond's Motion. In particular, the United States files this Statement to bring the Court's attention to the standards used to evaluate appropriate medical care for gender dysphoria under the Eighth Amendment and the unconstitutionality of freeze-frame policies that may prevent such treatment. In cases like Ms. Diamond's, gender dysphoria constitutes a serious medical need requiring appropriate treatment. For that reason, proscriptive freeze-frame policies are facially unconstitutional under the Eighth Amendment because they do not provide for individualized assessment and treatment.

## INTEREST OF THE UNITED STATES

The United States has authority to file this Statement of Interest pursuant to 28 U.S.C § 517, which permits the Attorney General to attend to the interests of the United States in any case pending in a federal court.[2] The United States enforces the rights of incarcerated individuals pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997. CRIPA authorizes the Attorney General to investigate conditions of confinement in

---

[2] The full text of 28 U.S.C. § 517 is as follows: "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

correctional facilities and bring a civil action against a State or local government that, pursuant to a "pattern or practice" of conduct, "is subjecting persons residing in or confined to an institution . . . to egregious or flagrant conditions which deprive such persons of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 42 U.S.C. § 1997(a).

The United States has a broad interest in ensuring that conditions of confinement in state and local correctional facilities are consistent with the Constitution and federal law. To that end, the Department of Justice has previously exercised its CRIPA authority to investigate jurisdictions for issues similar to those presented in this case, such as access to adequate medical and mental health care and protection from harm for lesbian, gay, bisexual, transgender, and intersex prisoners.[3]

The United States also has a strong interest in protecting the rights of lesbian, gay, bisexual, and transgender individuals more broadly. Accordingly, the United States is active in litigation involving employment discrimination against transgender individuals under Title VII of the Civil Rights Act; discrimination and harassment of transgender students in schools under

---

[3] *See, e.g.*, Letter from Loretta King, Acting Assistant Att'y Gen. of the United States, U.S. Dep't of Justice, to Marlin N. Gusman, Sheriff, Orleans Parish Sheriff's Office (Sept. 11, 2009), *available at* http://www.justice.gov/crt/about/spl/documents/parish_findlet.pdf (finding that the Orleans Parish Sheriff's Office failed to provide Orleans Parish Prison detainees with constitutional levels of medical and mental health care); Letter from Thomas Perez, Assistant Att'y Gen. of the United States, U.S. Dep't of Justice, to Carlos A. Gimenez, Mayor, Miami-Dade Cnty. (Aug. 24, 2011), *available at* http://www.justice.gov/crt/about/spl/documents/Miami-Dade_findlet_8-24-11.pdf (finding that the Miami-Dade County Jail failed to provide detainees with appropriate medical and mental health care, including screening, chronic care, and access to services for acute needs); Letter from Jocelyn Samuels, Acting Assistant Att'y Gen. of the United States, U.S. Dep't of Justice, to Robert Bentley, Governor, State of Ala. (Jan. 17, 2014), *available at* http://www.justice.gov/crt/about/spl/documents/tutwiler_findings_1-17-14.pdf (raising concerns regarding the treatment of lesbian, gay, bisexual, transgender, and intersex prisoners at Julia Tutwiler Prison for Women).

Title IX of the Education Amendments of 1972; and discrimination against transgender individuals in violation of the Fair Housing Act.[4]

## FACTUAL BACKGROUND

Ms. Diamond's Complaint (ECF No. 3) and the supporting materials for her Motion for Preliminary Injunction (ECF No. 2) detail the factual background concerning Ms. Diamond's medical history and treatment while incarcerated in the GDOC. Rather than repeat these allegations in full, the United States summarizes the general factual allegations upon which this Statement of Interest relies.[5]

Ms. Diamond suffers from gender dysphoria. Gender dysphoria is listed in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-V) as a major mental illness and characterized by a marked incongruence between one's experienced/expressed gender and assigned gender at birth. Gender dysphoria involves a persistent physical and emotional discomfort with one's biological sex. Left untreated, that discomfort can become so painful that individuals consider or attempt suicide, self-castration, or self-mutilation. The accepted course of treatment to alleviate these symptoms often involves allowing the individual to live as his or her chosen gender, through one or more of the following treatments: changes in gender expression

---

[4] *See, e.g.*, Statement of Interest of the United States, *Jamal v. SAKS & Co.*, No. 4:14-CV-2782 (S.D. Tex. 2015), ECF No. 1, *available at* http://www.justice.gov/crt/about/emp/documents/jamalsoi.pdff (Title VII's prohibition of discrimination on the basis of sex proscribes discrimination because of transgender status); Statement of Interest of the United States, *Tooley v. Van Buren Pub. Sch., et al.*, No. 2:14-CV-13466 (E.D. Mich. 2015), ECF No. 64-1, *available at* http://www.justice.gov/crt/about/edu/documents/tooleysoi.pdf (discrimination based on transgender status constitutes discrimination based on sex for purposes of Title IX and Equal Protection Clause of the Fourteenth Amendment, regardless of whether there is evidence of sex stereotyping); *see also* Mediated Settlement Order, *United States v. Toone*, No. 6:13-CV-744 (E.D. Tex. 2014), ECF No. 45, *available at* http://www.justice.gov/crt/about/hce/documents/toonesettle.pdf (settling action brought by United States against owner of a trailer park in Texas for discrimination against renter based on transgender status in violation of the Fair Housing Act).

[5] As noted above, the United States does not take a position on the accuracy of the facts asserted in Ms. Diamond's Complaint and Motion for Preliminary Injunction. The United States assumes those facts to be true for the purposes of this Statement of Interest.

4

and role; dressing, grooming, and otherwise outwardly presenting in a manner consistent with one's gender identity; hormone therapy; and, in some cases, surgery to change primary and/or secondary sex characteristics.[6]

Ms. Diamond states that she was first diagnosed with gender dysphoria when she was a teenager, nearly twenty years ago.[7] Ms. Diamond also states that she lived as a female in the community prior to incarceration, and took feminizing hormones for seventeen years, which caused her to develop female secondary sex characteristics such as breasts and soft skin.[8] When GDOC processed Ms. Diamond through intake, she presented as female; identified as transgender; and discussed her medical history, including her diagnosis of gender dysphoria and hormone therapy.[9] However, for reasons not explained in the current pleadings, GDOC did not refer Ms. Diamond for additional evaluation or treatment. Instead, GDOC terminated Ms. Diamond's hormone therapy and confiscated her female clothing and undergarments before placing her in a male facility.[10] This had a profound physical and emotional impact on Ms.

---

[6] Compl. ¶¶ 28-31 (discussing the World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* 9-10 (7th ed. 2011), *available at* http://admin.associationsonline.com/uploaded_files/140/files/Standards%20of%20Care%20V7%20-%202011%20WPATH.pdf).
[7] Compl. ¶¶ 38-39.
[8] Compl. ¶ 40.
[9] Compl. ¶ 44.
[10] *See* Compl. ¶¶ 45, 64. Ms. Diamond's complaint and recently-filed Emergency Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 25) raise additional allegations concerning her placement in a maximum security male facility and GDOC's failure to protect her from sexual abuse and harassment. Because those issues were not covered in Ms. Diamond's Motion for Preliminary Injunction (ECF No. 1), the United States does not address them in this Statement of Interest. The United States may choose to weigh in on the constitutionality of GDOC's conduct on those issues at a later date. The United States has previously investigated jurisdictions pursuant to CRIPA for failure to protect prisoners from sexual abuse. *See generally* Letter from Jocelyn Samuels, Acting Assistant Att'y Gen. of the United States, U.S. Dep't of Justice, to Robert Bentley, Governor, State of Ala. (Jan. 17, 2014), *available at* http://www.justice.gov/crt/about/spl/documents/tutwiler_findings_1-17-14.pdf (concluding that administrators at the Julia Tutwiler Prison for Women failed to keep women prisoners safe from harm due to sexual abuse and harassment from correctional staff); Letter from Thomas E. Perez, Assistant Att'y Gen. of the United States, U.S. Dep't of Justice, to Samuel Brownback, Governor, State of Kan. (Sept. 6, 2012), *available at*

Diamond. Terminating her hormone therapy created painful side effects, including chest pains, heart palpitations, clinically significant depression, and increased thoughts of suicide, hopelessness and anxiety.[11] According to Ms. Diamond, her gender dysphoria is so severe that she has attempted suicide and self-castration on multiple occasions during her incarceration.[12]

Multiple GDOC clinicians later confirmed Ms. Diamond's gender dysphoria. Those GDOC clinicians recommended treatment, including hormone therapy and allowing Ms. Diamond to outwardly express her female gender identity through dress and adherence to female grooming standards.[13] GDOC never provided this recommended treatment.[14] When Ms. Diamond requested treatment consistent with her clinician's recommendations, GDOC officials told her that such treatment was either not available or prohibited by GDOC's freeze-frame policy.[15] That policy prohibits initiating new treatments for gender dysphoria for prisoners who either did not receive such treatments in the community, or who were not identified as transgender and referred for such treatment during the intake process.[16] Ms. Diamond filed this suit to combat this policy and obtain the treatment recommended by her GDOC clinicians.

## DISCUSSION

Ms. Diamond claims that the GDOC violated her constitutional right to be free from cruel and unusual punishment under the Eighth Amendment by failing to provide her with adequate treatment for her gender dysphoria. Ms. Diamond is challenging both the individual treatment

---

http://www.justice.gov/crt/about/spl/documents/topeka_findings_9-6-12.pdf (concluding that administrators at the Topeka Correctional Facility fail to protect women prisoners from harm due to sexual abuse and misconduct).
[11] *See generally* Compl. ¶¶ 5, 96, 121, 138-39.
[12] *See generally* Compl. ¶¶ 38-39, 44, 73-76, 90, 96-97, 104, 116-18.
[13] *See* Compl. ¶¶ 75, 96.
[14] *See* Compl. ¶¶ 75-76, 95-97.
[15] *See* Compl. ¶¶ 74-76, 79-91, 95-97, 107-10, 117-18.
[16] Compl. ¶¶ 48-50.

she received, and the constitutionality of the GDOC policy that she believes prevented her treatment. Accordingly, Ms. Diamond is currently seeking two preliminary injunctions: one directing Defendants to provide her with medically necessary treatment for her gender dysphoria, including hormone therapy and allowing her to express her female gender through grooming, pronouns, and dress, and the second enjoining Defendants from enforcing their freeze-frame policy, which Ms. Diamond asserts contributes to the on-going violation of her Eighth Amendment Rights.[17]

The Court should grant Ms. Diamond's request for a preliminary injunction if it finds that (1) she has a strong likelihood of success on the merits of her underlying claims; (2) she will suffer irreparable injury unless the injunction issues; (3) the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014). Although the United States believes that the facts alleged in Ms. Diamond's Motion, if true, would be sufficient to satisfy each of the four elements,[18] it limits its Statement of Interest to the first prong – whether Ms. Diamond has a substantial likelihood of success on the merits of her two Eighth Amendment claims. The United States asserts that, under the facts alleged, Ms. Diamond will be successful in showing that she has thus far received a constitutionally inadequate level of medical care for her gender dysphoria, and that the policy preventing her from receiving more appropriate and individualized treatment – the "freeze-frame" policy – is facially unconstitutional.

---

[17] Pl.'s Mot. for Prelim. Inj. 1, ECF No. 1.
[18] In particular, the facts as alleged indicate that Ms. Diamond will experience irreparable harm if a preliminary injunction is not granted. Ms. Diamond continues to experience significant distress as a result of being forced to live as a man, and medical personnel familiar with gender dysphoria who evaluated Ms. Diamond indicated that she is at an "extremely high risk of continued decompensation and suicide." Mem. in Supp. of Prelim. Inj. 18, ECF No. 2.

## I. GDOC Violates the Eighth Amendment by Failing to Provide Ms. Diamond with Adequate Medical Treatment for her Serious Medical Needs

Ms. Diamond must meet two elements to prevail on an Eighth Amendment claim for inadequate medical care. First, Ms. Diamond must show that she has an objectively serious medical need. *See Estelle,* 429 U.S. at 104. Second, Ms. Diamond must show that prison officials were "deliberately indifferent" to that need, meaning they knew there was a substantial risk of harm to Ms. Diamond if the need was not met, yet they disregarded that risk by conduct that amounted to more than mere negligence. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1970); *Kothmann,* 558 F. App'x at 910; *Lancaster v. Monroe Cnty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997).

### a. *Ms. Diamond's gender dysphoria and risk of self-harm constitute serious medical needs under the Eighth Amendment*

The first element is easily met in this case. An "objectively serious medical need" is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (quoting *Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir. 2003)). Courts have routinely held that gender dysphoria is a serious medical need under the Eighth Amendment. *Battista v. Clarke*, 645 F.3d 449 (1st Cir. 2011); *Allard v. Gomez*, 9 F. App'x 793, 794 (9th Cir. 2001) (citing *Meriwether v. Faulkner*, 821 F.2d 408, 412-13 (7th Cir. 1987)); *White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 243 (D. Mass. 2012); *Wolfe v. Horn*, 130 F. Supp. 2d 648, 652 (E.D. Pa. 2001).[19] Here, GDOC clinicians diagnosed Ms. Diamond with gender dysphoria

---

[19] These courts' conclusions are consistent with the views of the preeminent medical and professional associations that gender dysphoria is a serious medical condition for which treatment is necessary and effective. *See, e.g.*,

8

during her first few years of incarceration. Those with training on gender dysphoria recommended hormone therapy and allowing Ms. Diamond to express her female gender identity. Ms. Diamond's gender dysphoria therefore constitutes a serious medical need deserving of adequate treatment under the Eighth Amendment.

Further, Ms. Diamond has a documented risk of engaging in self-harm, which may constitute a serious medical need separate from the underlying gender dysphoria deserving of treatment under the Eighth Amendment. *See De'lonta v. Angelone (De'lonta I)*, 330 F.3d 630, 634 (4th Cir. 2003) ("De'lonta's need for protection against continued self-mutilation constitutes a serious medical need to which prison officials may not be deliberately indifferent.") (citing *Lee v. Downs*, 641 F.2d 1117, 1121 (4th Cir. 1981) (explaining that "prison officials have a duty to protect prisoners from self-destruction or self-injury")). Ms. Diamond's extensive history of attempting suicide and self-castration demonstrate that she has a second serious medical need, distinct from her diagnosis of gender dysphoria – the need to be kept safe from self-harm.

### b. *GDOC knew of Ms. Diamond's serious medical needs and the risk they posed to her health and safety, yet unconstitutionally disregarded that risk*

The second element of an Eighth Amendment claim is also clear in this case. Ms. Diamond has shown that GDOC officials' conduct amounts to deliberate indifference, because they knew of and disregarded her serious medical needs that created a risk to Ms. Diamond's health and safety. Under the facts as alleged, GDOC officials knew of Ms. Diamond's gender

---

American Medical Association, *Resolution: Removing Financial Barriers to Care for Transgender Patients* (2008), *available at* http://www.tgender.net/taw/ama_resolutions.pdf; American Psychological Association, *Transgender, Gender Identity & Gender Expression Non-Discrimination* (2008), *available at* http://www.apa.org/about/policy/transgender.pdf; World Professional Association of Transgender Health, *WPATH Clarification on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage for Transgender and Transsexual People Worldwide* (2008), *available at* http://www.wpath.org/uploaded_files/140/files/Med%20Nec%20on%202008%20Letterhead.pdf.

9

dysphoria, past suicide attempts, self-mutilation, and attempts at self-castration. The issue then becomes whether GDOC officials impermissibly disregarded Ms. Diamond's medical needs and the risks they posed.

Under any rubric, GDOC did not provide Ms. Diamond with adequate care. Although prisoners do not have the right to the medical treatment of their choice, the important consideration under the Eighth Amendment is not whether *any* care was provided, but rather whether the level of care provided was constitutionally adequate. *See Estelle*, 429 U.S. at 103-06; *Kothmann*, 558 F. App'x at 910; *De'lonta v. Johnson (De'lonta II)*, 708 F.3d 520, 526 (4th Cir. 2013) (holding that "just because [Defendants] have provided [Plaintiff] with *some* treatment consistent with the [WPATH Standards of Care], it does not follow that they have necessarily provided her with constitutionally adequate treatment.") (emphasis in original); *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) ("plaintiff's receipt of *some* medical care does not automatically defeat a claim of deliberate indifference"). Indifference to a serious medical need can occur in many forms, "whether . . . manifested by prison doctors in response to the prisoner's needs" or by officials "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once proscribed." *Estelle*, 429 U.S. at 105-06. "Delays, poor explanations, missteps, changes in position, and rigidities" which result in the delay or denial of adequate treatment may be sufficient to prove deliberate indifference. *Battista*, 645 F.3d at 455.

In assessing Ms. Diamond's Eighth Amendment claim, the Court should determine whether the current course of treatment is medically adequate, which may be informed by current professional standards of care. *Estelle*, 429 U.S. at 102 (courts should look to the

10

"evolving standards of decency that mark the progress of a maturing society."); *United States v. DeCologero*, 821 F.2d 39, 43 (1st Cir. 1987) (the Eighth Amendment requires medical care "at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards.") (*cited with approval in Fernandez v. United States*, 941 F.2d 1488, 1493-4 (11th Cir. 1991); *see also Kosilek v. Maloney*, 221 F. Supp. 2d 156, 180 (D. Mass. 2002); *Barrett v. Coplan*, 292 F. Supp. 2d 281, 285 (D.N.H. 2003) ("'Adequate medical care' requires treatment by qualified medical personnel who provide services that are of a quality acceptable when measured by prudent professional standards in the community, tailored to an inmate's particular medical needs, and that are based on medical considerations.").[20]

Two things are clear from the record in this case: one, the generally accepted standards for treatment of gender dysphoria require treatment decisions be individualized; and two, Ms. Diamond did not receive individualized care. As other courts have recognized, the World Professional Association for Transgender Health (WPATH) is "an association of medical, surgical and mental health professionals specializing in the understanding and treatment of [gender dysphoria]." *See*, *e.g.*, *O'Donnabhain* v. *Comm'r*, 134 T.C. 34, 36 (2010). Since the 1970s, WPATH has published "Standards of Care," which set forth WPATH's recommendations

---

[20] The United States recognizes that in the corrections context additional considerations may weigh against implementing certain medical recommendations. However, officials must be able to articulate those considerations with specificity and substantiate that the recommended treatment would give rise to concerns that cannot otherwise be adequately addressed. General, amorphous security concerns cannot be grounds for refusing to provide medically recommended treatment. *See, e.g.*, *Soneeya*, 851 F. Supp. 2d at 250 (finding deliberate indifference where DOC failed to engage in individualized inquiry into prisoner's medical needs and security implications of various treatments, and instead relied on blanket prohibitions and "amorphous security concerns" as grounds to refuse treatment). Specific security concerns must be balanced against the medical need. And, importantly, officials cannot deny treatment merely because it is expensive or controversial. *See Kosilek*, 221 F. Supp. 2d at 192; *Barrett*, 292 F. Supp. 2d at 286 ("[T]he Eighth Amendment does not permit necessary medical care to be denied to a prisoner because the care is expensive or because it might be controversial or unpopular.").

11

for the treatment of gender dysphoria and the research supporting those recommendations.[21] The Standards, which were most recently updated in 2011, make clear that a variety of therapeutic interventions may be appropriate, and that the necessary course of treatment must be determined on an individual basis.[22] Importantly, however, the Standards of Care recognize that the appropriate course of treatment should be decided after evaluation by a qualified medical professional who has specific knowledge of and training in the diagnosis and treatment of gender dysphoria.[23] Here, GDOC displayed deliberate indifference by ignoring its clinicians' individualized treatment recommendations for Ms. Diamond. GDOC clinicians with training on gender dysphoria reconfirmed Ms. Diamond's gender dysphoria diagnosis. Based on their individualized assessments and clinical training, these doctors recommended hormone therapy and permission to express female gender identity as the appropriate course of treatment for Ms. Diamond, given the severity of her symptoms and the recommendations contained in the Standards of Care. Yet, GDOC never provided any part of this treatment. Instead, GDOC officials told Ms. Diamond that GDOC does not provide treatment for gender dysphoria beyond antipsychotic medication and/or basic counseling, and that further treatment would be denied pursuant to GDOC policy. GDOC delayed referrals to appropriate health care providers, denied the care recommended by Ms. Diamond's treating clinicians, and otherwise refused to acknowledge Ms. Diamond's serious medical needs. These delays and failures to follow medical determinations amount to deliberate indifference. *Battista*, 645 F.3d at 455.

---

[21] World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (7th ed. 2011), *available at* http://admin.associationsonline.com/uploaded_files/140/files/Standards%20of%20Care%20V7%20-%202011%20WPATH.pdf.
[22] *Id.* at 8.
[23] *See generally id.* at 22-23.

12

Indeed, Ms. Diamond's assertion that she was on feminizing hormones in the community for seventeen years and that GDOC abruptly discontinued this treatment upon intake is especially troubling in the Eighth Amendment context. As noted by WPATH, grave consequences are associated with a sudden withdrawal of hormones, including self-castration and increased risk of suicide.[24] Ms Diamond's case was no exception. Abruptly terminating Ms. Diamond's medical treatment caused her condition to deteriorate and reversed the years of therapeutic benefits she experienced by taking hormones in the community. As recognized by one court, "taking measures which actually reverse the effects of years of healing medical treatment . . . is measurably worse" than merely failing to provide inmates with care that would improve their medical state, thereby "making the cruel and unusual determination much easier." *Phillips v. Mich. Dep't of Corr.*, 731 F. Supp. 792, 800 (W.D. Mich. 1990); *see also Wolfe*, 130 F. Supp. 2d at 653 ("abrupt termination of prescribed hormonal treatments by a prison official with no understanding of [Plaintiff's] condition, and failure to treat her severe withdrawal symptoms or after-effects, could constitute 'deliberate indifference'"); *Fields*, 653 F.3d at 554 ("When hormones are withdrawn from a patient who has been receiving hormone treatment, severe complications may arise. The dysphoria and associated psychological symptoms may resurface in more acute form."). Terminating Ms. Diamond's hormone therapy at intake caused her great suffering: she has lost breast mass and other female secondary sex characteristics, and continues to experience physical pain, muscle spasms, heart palpitations, vomiting, dizziness, hot flashes, and other symptoms of hormone withdrawal.[25]

---

[24] *Id.* at 68.
[25] Compl. ¶ 138.

13

Based on the facts alleged in the Complaint, GDOC did not provide Ms. Diamond with constitutionally adequate treatment for her gender dysphoria. Ignoring Ms. Diamond's need for such treatment and her history of self-harm and multiple suicide attempts, GDOC made no efforts to provide Ms. Diamond with anything beyond general counseling and antipsychotic medication – therapies that were well below the level of treatment that was medically indicated and recommended by the qualified GDOC medical personnel who evaluated Ms. Diamond. For these reasons, GDOC was and remains deliberately indifferent to Ms. Diamond's serious medical needs.

## II. "Freeze-Frame" policies do not adequately address the individualized medical needs of inmates and therefore violate the Eighth Amendment

Ms. Diamond's Motion for Preliminary Injunction not only challenges her individual treatment – it also addresses the facial constitutionality of GDOC's policy regarding the treatment of all individuals with gender dysphoria in GDOC custody. Because GDOC's policy amounts to a blanket prohibition of certain treatments for certain inmates, without regard to an individual's medical needs or their progression over time, it does not pass constitutional muster, and must be struck down.

GDOC Standard Operating Procedure VH47-0006, "Management of Transsexuals," states that prisoners identified as transgender at intake should be referred for medical evaluation.[26] However, the policy also states that GDOC will only provide "maintenance" of a prisoner's "transgender status,"[27] meaning that GDOC will not begin new treatments or advance the level of care for transgender prisoners beyond that which they received in the community.

---

[26] GDOC Standard Operating Procedure VH47-0006, "Management of Transsexuals," Mem. in Supp. of Mot. Prelim. Inj. 2, Ex. 3, ECF No. 2-3.
[27] *Id.*

14

Under this policy, prisoners must be identified as transgender at intake and referred for further evaluation in order to receive *any* treatment, and the treatment they may receive is decidedly limited.[28] As a result, many prisoners – including those not identified at intake, or those whose gender dysphoria worsens during their incarceration – are denied the medical care necessary to protect their health and safety.

Such a policy cannot stand under the Eighth Amendment. Courts have continuously struck down similar policies that place a blanket prohibition on certain kinds of medical care. In *Fields v. Smith*, 653 F.3d 550, 557-58 (7th Cir. 2011), the Seventh Circuit considered a Wisconsin state statute that prohibited the Wisconsin Department of Corrections from providing hormone therapy or sexual reassignment surgery to prisoners. The district court found the statute to be facially unconstitutional because "[t]he statute applies irrespective of an inmate's serious medical need or the DOC's clinical judgment." *Id.* at 559 (*citing Fields v. Smith*, 712 F. Supp. 2d 830, 867 (E.D. Wisc. 2010)). In upholding the district court's determination, the Circuit noted that "[j]ust as the legislature cannot outlaw all effective cancer treatments for prison inmates, it cannot outlaw the only effective treatment for a serious condition like [gender dysphoria." *Id.* at 557. Other courts to consider similar blanket prohibitions on treatment for gender dysphoria have reached the same conclusions. *See, e.g., De'lonta I*, 330 F.3d at 635 (terminating hormone treatment based on blanket policy may amount to Eighth Amendment

---

[28] As Ms. Diamond points out, this is especially problematic if intake personnel are not trained on gender dysphoria. *See* Compl. ¶ 48. Under GDOC policy, intake personnel are the only line of defense for transgender prisoners in need of treatment for gender dysphoria. If intake personnel are untrained or unaware on the basic of this condition, prisoners in need of such treatment will not be referred and will subsequently be denied necessary care. For example, it is unclear why Ms. Diamond herself was not referred for evaluation for gender dysphoria after presenting as transgender at intake; presumably, Ms. Diamond should have been referred pursuant to GDOC policy given her self-identification as transgender, her medical history, and her use of hormones in the community. Yet, because she was not referred and properly diagnosed at the initial intake stage, Ms. Diamond continued to be denied treatment pursuant to GDOC policy throughout her incarceration.

violation); *Allard*, 9 F. App'x at 795 (denial of hormone therapy based on blanket rule rather than individualized medical evaluation constitutes deliberate indifference).

Blanket prohibitions on all gender dysphoria treatment are identical to freeze-frame policies for the purposes of the Eighth Amendment; both types of policies strike an arbitrary line that preclude individualized medical evaluations and proscribe physician's ability to provide appropriate care. *Soneeya*, 851 F. Supp. 2d at 243-44; *Kosilek*, 221 F. Supp. 2d at 193 (presumptive freeze-frame policies are constitutionally permissible *only* if exceptions are made when necessary, as determined by sound medical judgment and adherence to prudent professional standards); *Barrett*, 292 F. Supp. at 286 ("A blanket policy that prohibits a prison's medical staff from making a medical determination of an individual inmate's medical needs and prescribing and providing adequate care to treat those needs violates the Eighth Amendment.").

For example, in *Brooks v. Berg*, a district court considered the constitutionality of the New York Department of Correctional Services' (NYDOCS) freeze-frame policy. *Brooks v. Berg*, 270 F. Supp. 2d 302, 312 (N.D.N.Y. 2003) *vacated in part on other grounds*, 289 F. Supp. 2d 286 (N.D.N.Y. 2003). Under that policy, NYDOCS provided treatment for gender dysphoria only to those prisoners who could prove they received such treatment prior to incarceration. *Id.* at 305. There was no dispute that the plaintiff in *Brooks* was denied treatment for her GID; rather, defendants claimed qualified immunity on the grounds that they were following NYDOCS policy. *Id.* at 312. The district court rejected the defendants' immunity argument and held that NYDOCS' freeze-frame policy was facially unconstitutional. *Id.* In reaching this conclusion, the district court noted that the Eighth Amendment requires adequate treatment for *all* serious medical needs, and that "[t]here is no exception to this rule for serious medical needs

16

that are first diagnosed in prison." *Id.* This Court should reach a similar conclusion in the instant case.

Recognizing the need to treat prisoners according to their needs, rather than blanket rigid policies, the Federal Bureau of Prisons recently adopted a policy requiring an individualized assessment of the health needs of transgender prisoners.[29] The current policy, Federal Bureau of Prisons Program Statement 6031.04 ("Patient Care"), provides that prisoners in Bureau custody with a possible diagnosis of gender dysphoria "will receive a current individualized assessment and evaluation" and "[t]reatment options will not be precluded solely due to level of services received, or lack of services, prior to incarceration."[30]

For the above stated reasons, freeze-frame policies are facially unconstitutional. Ms. Diamond did not receive the treatment she needed because GDOC administrators purportedly followed GDOC's unconstitutional freeze-frame policy to determine the level of care to provide to Ms. Diamond. The United States therefore urges the Court to find that Ms. Diamond will have a strong likelihood of success on the merits of her facial challenge to GDOC's current policy governing the treatment of gender dysphoria.

## CONCLUSION

Failure to provide adequate treatment for transgender inmates with gender dysphoria constitutes cruel and unusual punishment under the Eighth Amendment. Freeze-frame policies

---

[29] This policy came about as a result of litigation similar to the instant case. In 2009, Vanessa Adams, a Bureau prisoner, sued the Bureau for the Bureau's failure to treat her gender dysphoria. At the time, the Bureau followed a "freeze-frame" policy, similar to GDOC's policy, which allowed prisoners with gender dysphoria to receive only the level of treatment they received in the community prior to incarceration. In 2011, Ms. Adams and the Bureau settled Ms. Adams claims – the Bureau reformed its policy and agreed to provide Ms. Adams with medically necessary treatment for her gender dysphoria. *See generally Adams v. Federal Bureau of Prisons*, No. 09-CV-10272 (D. Mass.).

[30] U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 6031.04 ("Patient Care") at 42, June 3, 2014, *available at* http://www.bop.gov/policy/progstat/6031_004.pdf.

and other policies that apply blanket prohibitions to such treatment are facially unconstitutional because they fail to provide individualized assessment and treatment of a serious medical need. Accordingly, the United States urges the Court to (1) find that Ms. Diamond has a substantial likelihood of success on the merits of her claims, (2) declare that GDOC's freeze-frame policy is facially unconstitutional under the Eighth Amendment, and (3) issue appropriate injunctive relief.

Respectfully submitted,

MICHAEL J. MOORE
United States Attorney
Middle District of Georgia

VANITA GUPTA
Acting Assistant Attorney General
Civil Rights Division
United States Department of Justice

BERNARD SNELL (GA 665692)
Assistant United States Attorney
Middle District of Georgia
300 Mulberry Street, Suite 400
Macon, GA 31201
(478) 752-3511

MARK KAPPELHOFF
Deputy Assistant Attorney General
Civil Rights Division

JUDY PRESTON
Acting Chief
Civil Rights Division
Special Litigation Section

JULIE ABBATE
Deputy Section Chief
Civil Rights Division
Special Litigation Section

/s
SHARON BRETT (NY 5090279)
Trial Attorney
Civil Rights Division
Special Litigation Section
Telephone: (202) 353-1091
Sharon.Brett@usdoj.gov

*Attorneys for the United States of America*

18

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2015, a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

__/s/_____
SHARON BRETT (NY 5090279)
Trial Attorney
Civil Rights Division
Special Litigation Section
Telephone: (202) 353-1091
Sharon.Brett@usdoj.gov
*Attorney for the United States of America*